UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION – DETROIT

In re:

MICHELLE DENISE STEWART,                           Case No. 10-41342-wsd

Debtor.                                            Chapter 7

                                                   Hon. Walter Shapero

_____/

## OPINION REGARDING DEBTOR'S MOTIONS TO HOLD BALDWIN SUMMIT ET AL. IN VIOLATION OF AUTOMATIC STAY AND COMPEL RELEASE OF PROPERTY

The Debtor Michelle Stewart filed for Chapter 7 Bankruptcy protection on January 18, 2010. She had operated a pizza establishment and several pieces of restaurant equipment were left in her vacated commercial lease space ("the premises") and are currently in the control of Royal Management, LLC, Marcus Evangelista, and Baldwin Summit, LLC (collectively "the Creditors"). Debtor filed a Motion to Compel Release of Debtor's Property and a Motion to Hold Creditors in Violation of 11 U.S.C. §§ 362(a)(3),(a)(6), and (a)(7), and 11 U.S.C. § 727, essentially alleging that Creditors converted and failed to return her equipment. Following an evidentiary hearing, the parties submitted post-trial briefs outlining the issues. The Court finds the Creditors liable for converting the property and for violating the automatic stay with respect to some of Debtor's equipment.

### BACKGROUND

In March 2005, the Debtor signed a five year lease (the "Orion Lease") with Orion Village Crossing, LLC ("Orion Village") for commercial space within the Orion Village Shopping Center at 3647 Baldwin Road, Orion, Michigan. She used this space to operate Paesano's Pizza, a carry-out pizza restaurant, and acquired several pieces of commercial

1

restaurant equipment and related items ("the Equipment") which are the subject of this dispute. While the exact commencement date after March 2005 of the five year lease term is not clear (given what appears to have been certain work required to be completed by the landlord before that term officially started), what is clear is that the five year term had not expired as of January, 18, 2010 when this bankruptcy case was filed.

Paesano's Pizzeria had operating net losses from 2007-2009. By 2009, Debtor was several months delinquent on her lease payments to Orion Village. In December 2009, Orion Village initiated an action against Debtor, seeking possession of the premises and $14,543 in back rent. While the date of such is in dispute, at some point during late 2009 or early 2010, Debtor ceased operating Paesano's Pizza. Thereafter she returned to the premises several times to clean and collect smaller items, but did not have the means to move or store the larger Equipment. The landlord claimed ownership of this Equipment. On January 5, 2010, the state court entered a stipulated order under which Debtor "voluntarily agree[d] not to remove any equipment, fixtures or other items from the subject property pending the resolution of this lawsuit" effectively preserving the status quo. (Stipulated Order for Adjournment, Ex. 13, at 1). Upon later learning of the Debtor's bankruptcy, the state court ordered an administrative closing of the case pursuant to the bankruptcy stay. (Order for Administrative Closing, Ex. 14, at 1). The resolution of the ownership or of entitlement to this Equipment thereafter became a matter before this Court.

Debtor listed the remaining Orion Lease as an Unexpired Lease on her Bankruptcy Schedule G. On schedule B, she claimed assets worth $9,370, consisting of "Pizzeria Equipment, oven, scales grater, sign, fryer, tables, shelving, racks screens, pans, mixer exhaust fan, hood, sink, cooler, phones, POS system, [and] flour bin." On April 23, 2010, the trustee filed an asset

report intending to abandon the property pursuant to 11 U.S.C. § 554(c), and later filed his final report on December 3, 2010 concluding that there were no assets to distribute. As noted, this Equipment remains on the premises and is the subject of this dispute.

While the state court ejectment action against Debtor was ongoing, Orion Village defaulted on its loan from Fifth Third Bank, which held a mortgage on the Orion Village Shopping Center. Fifth Third foreclosed and Agree Realty was appointed receiver. On February 10, 2010, Agree Realty took control of the premises and states that it found the unit in a "filthy and contaminated" condition. (Cohon Aff., Ex. 4, at 1). As receiver for the property, it cleaned and sanitized the unit. Meanwhile, Fifth Third sold its interest in the Orion Shopping Center to Baldwin Summit, LLC, the closing on which occurred on April 1, 2010. As the statutory right of redemption period had not yet expired, Agree Realty continued to manage the Orion shopping center until the right of redemption expired in July 2010.

Upon expiration of the redemption period, Baldwin Summit LLC took effective control over the Orion shopping center and appointed Royal Management LLC to manage it. Dr. Stella Evangelista and Jose Evangelista are the sole managing members of both Baldwin Summit LLC and Royal Management LLC. Dr. Evangelista's son, Marcus Evangelista ("Mr. Evangelista"), is the general counsel and resident agent for both entities. Mr. Evangelista has been representing himself and both indicated Evangelista entities during the pendency of this case.

In June 2010, Debtor's counsel, Raymond Mashni contacted Mr. Evangelista regarding the Equipment. Mashni informed Mr. Evangelista of Debtor's bankruptcy filing and claimed the Equipment was property of the Debtor and she wanted access to the premises to remove it. Mr. Evangelista, relying on opinion of outside counsel, took the position that Baldwin Summit's purchase of the Orion Shopping Center included all personal property and fixtures within the

leased premises. This position was apparently based upon a clause in the Orion Lease ("the Abandonment Clause") which provides for the transfer of title to the landlord of all personal property and fixtures remaining in the premises at the end of the tenant's lease term.

Creditors argue that when Debtor allegedly vacated the premises in 2009, she abandoned the Equipment and it thereby became property of Orion Village. These rights transferred to Fifth Third Bank via the foreclosure and were ultimately sold to Baldwin Summit LLC as part of the April 1, 2010 shopping center sale transaction. Debtor claims that she never abandoned the premises. Rather, she states that for a period of time she operated Paesano's on a reduced basis as a cash business and continued to do so and only fully stopped operating and physically vacated the premises in January 2010. She also argues she was barred from returning to collect her property by the status quo order in the state court. Debtor thus argues that the Creditors, by refusing to return her Equipment, converted it and violated the automatic stay.

On November 18, 2010, Debtor filed a Motion to Compel the release of her Equipment. Five days later on November 23, 2010, Debtor filed a Supplementary Motion to Hold Royal Management, LLC, Baldwin Summit, LLC, Marcus Evangelista, and Orion Village Crossing, LLC[1] in violation of 11 U.S.C. §§ 362(a)(3),(6), and (7) and 11 U.S.C. § 727. Creditors filed a Motion for Summary Judgment in response. The parties later entered into a stipulated order which permitted the Court in the company of the parties to conduct an on-site inspection of the premises to verify what, if any, Equipment was actually still in the premises. Though some Equipment remains in the premises, several larger, more valuable items were missing. An evidentiary hearing was held, following which, the Court took present matters under advisement.

---

[1] Debtor has since amended her motion and removed Orion Village Crossing, LLC from this case.

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(a) and 157(a). This is a core proceeding under §§ 157(b)(2)(A) and (E).

## ISSUES PRESENTED

The Court must resolve the following issues:

(1) Did the Debtor by her actions or inactions lose her rights to the Equipment, thereby transferring free and clear title to the Equipment to the landlord, whose interest was subsequently purchased by the Creditors?

(2) If not, has Debtor proven superior rights in all or some of the Equipment, thus entitling her to recover against Creditors for conversion?

(3) Did the Creditors violate the automatic stay by exercising control over this Equipment?

## DISCUSSION

## I. Debtor's Ownership Rights in the Equipment

In order to determine whether or not a violation of the Bankruptcy Code occurred, this Court must first sort out the disputed property rights in the Equipment. "Whether a party has an interest in property and the extent of that interest is determined by applicable nonbankruptcy law." *In re Harchar*, 694 F.3d 639, 647 (6th Cir. 2012) (*citing Butner v. United States*, 440 U.S. 48, 54–55 (1979). Thus, Michigan law determines Debtor's rights in the Equipment.

### 1. The Orion Village Lease Agreement

According to Michigan law, "[w]hen a lease is unambiguous in its terms, what the parties intended by the language employed in the lease is a matter of law for the court's determination . . . ." *Hull v. Detroit Equip. Installation, Inc.*, 12 Mich. App. 532, 534 (1968). The relevant portion of the Orion Lease incorporating the Abandonment Clause, states:

5

Article 42 – Condition of Premises At End of Lease Term

> Prior to the expiration of the Term, Tenant shall remove all of its acquisition, equipment, fixtures, interior, and nylon signage and all items of personal property and shall leave the Premises in "broom clean" condition. Tenant shall repair all damage resulting from the removal of its exterior signage. Tenant shall schedule a walk-through inspection with Landlord's management company. Upon vacating the Premises, Tenant shall promptly return all of the keys to the Premises to Landlord. **Any equipment, fixtures, furnishings, or other items of personal property that remain within the Premises shall be deemed to be abandoned and Tenant expressly consents to the transfer of ownership of such property to Landlord free and clear of any claims of Tenant**. Notwithstanding the foregoing, until such time as Landlord accepts such transfer, Tenant shall remain liable for the full rental value of the Premises.

(Orion Lease, Ex. 20, page 7–8) (emphasis added). According to the Creditors, Debtor engaged in a "midnight move" in mid-2009, shutting down her business overnight with no intention to return. (Def.'s Mot. Summ. J. 3, ECF no. 59). Thus, they argue the applicability of the lease language that says "equipment, fixtures, or other items of personal property that remain[ed] within the Premises [were] deemed to be abandoned and Tenant expressly consents to the transfer of ownership of such property to Landlord free and clear . . . ." (Orion Village Crossing Lease Agreement, Ex. 20, at 7–8). I.e.: by operation of this clause, Debtor essentially forfeited all rights to her Equipment when she vacated the premises prior to the expiration of the lease.

In the Court's view, this is an incorrect construction of the indicated language. Article 42 of the lease contemplates the surrender of property *immediately following* the termination of the lease. This provision is entitled, "Condition of Premises *At End* of Lease Term." *Id*. (emphasis added). A logical reading of this provision presupposes a natural sequence of events, occurring chronologically, before the Abandonment Clause is triggered. First, "prior to the expiration of the Term," the tenant shall clean the property and remove all personal property and fixtures. *Id*. Second, "upon vacating" the tenant must then (1) schedule a walk-through with the landlord and

(2) return the keys. *Id*. Then, if personal property *remains* on the premises at that time, then it "shall be deemed to be abandoned." *Id.*

A fair reading of Article 42 provides that personal property of the tenant may only be abandoned to the lessor if the lease had terminated and property subsequently remained *after* its termination. This interpretation is supported by Article 17 of the same lease. It states: "*Upon expiration of the Term*, equipment, fixtures, inventory and/or other personal property owned by the Tenant which remains within the Premises shall be deemed abandoned and Landlord shall have the option to retain, sell or otherwise dispose of such personal property." (Orion Lease, Ex. 20, at 4) (emphasis added). This language indicates that property of the tenant is only deemed abandoned if it remains after termination of the lease.

Thus, in order for the Abandonment Clause of either Article 42 or Article 17 to trigger, the Lease Term must have been first terminated, either by operation of law or as agreed upon by the parties. Neither happened here. As noted, as of the date of Debtor's bankruptcy filing, the five year term of the Orion lease had not yet ended. Nor had the parties mutually agreed to terminate the lease. (Complaint for Nonpayment of Rent, Ex. 12, at 1) (Landlord seeking ejectment action and back rent). The ejectment action was not completed. (Order for Administrative Closing, Ex. 14, at 1). Thus, Creditors' only remaining option is to prove that Creditors' abandoned or surrendered the *premises*, thus prematurely terminating the lease and triggering the Abandonment Clause.

### 2.   The Orion Lease was Not Prematurely Terminated by Debtor or Landlord

Creditors argue that the lease term expired when Debtor allegedly vacated the premises and thus should be seen as having thereby abandoned the lease. This raised a factual issue. Debtor testified that she had actually been operating Paesano's until mid-January 2010. Creditors

7

provided evidence that indicated that the business was completely closed and vacated since mid-2009.

Under Michigan law, in order to establish that a leased premise was abandoned "[t]wo requirements must be met . . . . First, it must be shown that there is an intent to relinquish the property and, second, there must be external acts that put that intention into effect." *Sparling Plastic Indus., Inc. v. Sparling*, 229 Mich. App. 704, 717–18 (1998). "Nonuse alone is insufficient to prove abandonment." *Id.* at 718.

This situation is similar to the facts of *City of St. Peters v. Hill*, 9 S.W.3d 652 (Mo. Ct. App. 1999), which involved a restaurant lease including an abandonment provision nearly identical[2] to the one found in the Orion lease. In *Hill*, the subtenants ceased operating a restaurant business and vacated their lease early, leaving several pieces of restaurant equipment behind. *Hill*, 9 S.W.3d at 656. The court in *Hill* found for the landlord and denied the subtenant's judgment for conversion. In doing so, it held that the personal property within the unit reverted to the landlord because tenants had returned the keys to the Landlord and made no effort to regain possession of these items. *Id.* That evidenced the requisite intent to abandon coupled with an act manifesting this intent. *Id.*

Michigan law is in accord and consistent with other jurisdictions. *See Sparling*, 229 Mich. App. at 717–18 (holding that abandonment requires the intent to abandon and external acts that evidence this intention); *see also Perez Bar & Grill v. Schneider*, 2012-Ohio-5820 (Ohio Ct.

---

[2] The lease provision in *Hill* provided that:

 "[b]efore surrendering said premises, Tenant shall remove all its personal property including all trade fixtures, and shall repair any damage caused thereby. Tenant's obligations to perform this provision shall survive the end of the terms of this Lease, said property shall be deemed *abandoned* and shall become the property of Landlord." *City of St. Peters v. Hill*, 9 S.W.3d 652, 655 (Mo. Ct. App. 1999) (emphasis original).

App. Dec. 10, 2012) (despite evidence that the tenant's bar and grille had been closed for three months, court held that the tenant did not have the requisite intent to abandon); *but see Int'l Biochemical Indus., Inc. v. Jamestown Mgmt. Corp.*, 262 Ga. App. 770, 775 (2003) (holding that an identical abandonment clause was invoked only because the tenant had admitted that he in fact abandoned the property).

Debtor's actions in this case were insufficient to demonstrate intent to abandon the lease. One simply cannot perforce equate physically vacating leased premises—or reducing, suspending, or ending normal business operations, with abandonment of the lease covering those premises. The credible evidence does establish that Paesano's daily operations began dwindling, and were reduced, in 2009. However, the Court is persuaded by Debtor's testimony that she returned on occasion to clean the premises and run Paesano's sporadically on a reduced basis as a cash business. The failure to regularly or continuously do business from mid-2009 to early 2010 does not by itself constitute an abandonment of the lease. *See Jefferson Dev. Co. v. Heritage Cleaners*, 109 Mich. App. 606, 610. There was no affirmative act, such as returning her keys, which would establish a manifestation of her intent to surrender the lease. *See M & V Barocas v. THC, Inc.*, 216 Mich. App. 447, 451 (1996) (holding that abandonment did not occur when tenant continued to hold onto the keys and exercise right to control premises); s*ee also Hill*, 9 S.W.3d at 656 (holding that tendering the keys demonstrated an act sufficient to manifest intent to abandon lease). Court finds most revealing the fact that she left behind all this Equipment. *See Emmons v. Easter*, 62 Mich. App. 226, 237 (1975) (holding that plaintiff leaving valuable items behind is evidence that he didn't intend to abandon the premises). The Paesano's Equipment represented Debtor's livelihood and was much too large to be easily removed or

carried out quickly. The totality of the circumstances simply does not support a conclusion that the lease was abandoned.

This conclusion is reinforced by the landlord's own admissions. Orion Village clearly understood that Debtor was still exercising her rights with respect to the lease. In the eviction case, the Michigan District Court entered an order stipulating that "Michelle Stewart, d/b/a Paesano Pizzeria, voluntarily agrees not to remove any equipment, fixtures, or other items from the subject property pending the resolution of this lawsuit." (Stipulated Order for Adjournment, Ex. 13, at 1). When the landlord's managing partner was questioned regarding the necessity of this stipulation, he responded that it was "[t]o protect us". (Evidentiary Hr'g Tr. 18, May 1, 2013, ECF No. 133). Orion knew she was claiming a right to it and did not intend to simply leave it behind incident to an intent to abandon the lease.

The Court therefore concludes as a matter of fact and law the Orion Lease was not prematurely terminated by operation of law or by Debtor's actions or inactions. Thus, at the time Debtor filed bankruptcy the lease and her property within were hers and became property of the bankruptcy estate, superior to any property interests therein of Orion Village, Fifth Third Bank, and more importantly the Creditors.

## II. Creditors' Alleged Conversion of Debtor's Equipment

Next, the Court must now determine if Creditors' actions constituted a conversion. Debtor must prove by a preponderance of the evidence all elements of an alleged conversion, *Belcher v. Ranney*, 211 Mich. 438, 442 (1920), which are that (1) she had superior rights in the property, (2) she was entitled to possession, and (3) the Creditors wrongfully converted her property to their own. *Id.*; *see also* Michigan Non-Standard Jury Instr. Civil § 28:4 (2013). "The

gravamen of conversion is the non-privileged interference with superior possessory rights, generally in tangible property." *In re Pizzano*, 439 B.R. 445, 450 (Bankr. W.D. Mich. 2010).

### 1. Debtor's Superior Property Rights in the Allegedly Missing Equipment and the Equipment Still Located on the Premises

Initially, the Court must determine specifically which Equipment Debtor has superior rights in. There are two categories of Equipment at issue—the Equipment that is still on the premises—and the Equipment that Debtor alleges Creditors have removed. ("After" Inventory List, Ex. 28, at 1–2). Based on Debtor's sworn affidavit, the most notable missing items[3] include a three-door freezer valued at $700, a 60 quart mixer valued at $700, a Middleby Marshall oven valued at $3,000, an oven hood valued at $500, and a point-of-sale system valued at $1,000. ("After" Inventory List, Ex. 28, at 1–2). It is undisputed that the following items are still present in the premises: two prep tables valued at $400 each, a walk-in cooler valued at $500, two 5 ft. cooler shelving units valued at $50 each, one 3-compartment sink valued at $100, two hand sinks valued at $25 each, a 40lb. fryer with baskets valued at $300, a fryer hood valued at $50, 3 ft. x 6 ft. industrial shelving valued at $20, a freezer unit valued at $700, and a grease trap valued at $50. ("After" Inventory List, Ex. 28, at 1); (Inventory List of Royal Management Company LLC & Marcus Evangelista, ECF No. 73); (Evidentiary Hr'g Tr. 26–30, Apr. 30, 2013, ECF No. 132). Debtor claims that the Creditors removed the missing Equipment around November 20, 2010, based on her daily window-view inspections of the premises. Creditors claim that the property was gone when they assumed control on April 1, 2010. The Court has considered the following evidence and weighed it accordingly.

---

[3] The alleged missing items also include several smaller items that are incident to the daily operation of a pizzeria business. These include scales, graters, tables, pans, storage supplies, racks, and shelving, all of which are valued between $2 and $100 each.

*A. Debtor's Testimony*

The evidence supporting Debtor's claim is limited to her own affidavits and testimony. The Court directed Debtor to submit a "before" and "after" inventory list to define exactly what property was allegedly missing from the premises. (Stipulated Order, Sept. 15, 2011, ECF No. 90). Debtor had an opportunity to inspect the premises in order to create these inventory lists.[4] (Evidentiary Hr'g Tr. 30, Apr. 30, 2013, ECF No. 132) ("Q: There was an inspection conducted by you – A: Yeah. Q: – for the purposes of this litigation. A: There sure was. Q: Does this [inventory] list represent everything that's missing? 'Yes' or 'no'? A: Yes."). After the inspection, in a sworn affidavit, Debtor stated that all items in the "after" inventory list were missing from the premises, with the exception of the walk-in cooler, two prep tables, and a three-door freezer. (Stewart Aff., Ex. 2 ¶¶ 17–19, Ex. 2).

Debtor then to some extent contradicted these statements with her own testimony. When asked if "the hot water heater is still there," Debtor responded "[i]t is still there, yes." (Evidentiary Hr'g Tr. 26, Apr. 30, 2013). When asked about her claim regarding the allegedly missing HVAC unit, Debtor stated ". . . I don't know. I would have to physically get on the roof myself and go up there and look." (Evidentiary Hr'g Tr. 28, Apr. 30, 2013). With respect to the missing grease trap, the Debtor admitted that "[t]he grease trap is there." (Evidentiary Hr'g Tr. 29, Apr. 30, 2013). When asked about the shelving inside the cooler, Debtor also admitted "I don't know if I physically opened the door and looked in the cooler. . . . but, yes, I don't know." (Evidentiary Hr'g Tr. 29–30, Apr. 30, 2013). By producing the "after" inventory list without these items crossed off, Debtor claimed that they were missing and that the Creditors were

---

[4] The "after" list contained the same items, except that they were to be crossed off if they were still on the premises and accounted for.

responsible for the loss. However, on-site inspections of the premises by this Court and the parties have revealed that these same items are not missing.

Debtor offered no explanation as to why her testimony differed from her affidavit. (Evidentiary Hr'g Tr. 26, Apr. 30, 2013) (Q: "So why didn't you cross [the hot water heater] off the list? A: "I don't know."). The essence of Debtor's testimony can be best represented by her own admission on cross-examination regarding the inventory lists. She responded to opposing counsel: "[i]f you're willing to give it back, I'm willing to cross it off [the list]." (Evidentiary Hr'g Tr. 28, Apr. 30, 2013). Debtor missed the point of these lists and disregarded the Court's instructions. Whether Debtor intended to overreach in her sworn statements or did so negligently is not necessary for the Court to decide. Debtor has the burden of proof and her contradictory statements can adversely affect whether or not she has borne this burden.

B. *Lack of Documentation*

Debtor was unable to produce documentation proving her ownership of the allegedly missing items, i.e. Debtor admits that she does not have any records, receipts, or documentation regarding the same. (Evidentiary Hr'g Tr. 37, Apr. 30, 2013). She speculated during cross-examination that they may have been thrown out with her Equipment. (Evidentiary Hr'g Tr. 11, Apr. 30, 2013). However, she later explains that she purchased the Equipment from Restaurant Equippers, an "on-line restaurant supply company." (Evidentiary Hr'g Tr. 31, Apr. 30, 2013). Even if hard copies of these records were lost, the online nature of the supplier's business could have been explored and if so might have possibly revealed some records of these purchases.

C. *Rebuttal Testimony*

In her affidavits, Debtor claimed ownership of the Reznor Makeup heating and cooling system ("HVAC unit") valued at $21,000, the fire suppression system valued at $2,540, and the

hot water heater valued at $3,000. ("After" Inventory List, Ex. 29, at 2). However, Creditors have offered evidence to rebut these claims. Orion Village's managing partner, Ornio Mascone, testified that the sprinkler systems, HVAC unit, and hot water heater were all purchased and provided for by Orion Village Crossing (which is no longer a Defendant in this proceeding), and not by Debtor. (Evidentiary Hr'g Tr. 18–20, May 1, 2013).

More important are the terms of the Orion Lease. Article 33 of the Lease states that the "[l]andlord shall provide space with the improvements set forth on Exhibit C attached hereto." (Orion Lease, Ex. 20, at 6). These improvements listed on Exhibit C include a "1 Ton (per 400sq. ft) HVAC roof-top unit(s) . . . . Fire protection sprinkler system as required by the applicable building department. . . . one (1) six gallon electric hot water heater." (Orion Lease, Ex. 20, at C). The combination of the indicated testimony of Mr. Mascone and this lease provision outweigh Debtor's evidence, unsubstantiated by any third party, and such requires the Court to conclude that the water heater, fire suppression system, and HVAC system all belonged to Orion Village and not the Debtor.

The Creditors testified on multiple occasions that the premises have not changed since they took over, nor did they remove any Equipment from the premises. Several parties had access to the premises once Debtor vacated. These parties include Agree Realty, Fifth Third Bank, and the Debtor herself. Arguably at least, Creditors had an interest in all Equipment which in fact remained in the premises in April 2010 when they took control, as a potential attraction to future tenants, and such Equipment would be useful for many types of tenancies or uses. It would be illogical for them to simply dispose of these valuable pieces of Equipment as Debtor alleges.

### D. _Conclusions As To Missing And Certain Remaining Equipment_

In summary, this Court finds that Debtor has fallen short of her burden to prove both (a) her rights in the missing Equipment and (b) that the Creditors were the parties responsible for its removal. However, the evidence supports Debtor's superior rights in the property still situated on the premises (with the noted exception of the HVAC unit, the water heater, and the fire suppression system). Therefore, the Court concludes that the walk-in cooler, two 5ft. cooler shelving units, hand sink, 3-compartment sink, fryer with baskets and hood, 3 ft. x 6 ft. industrial shelving, freezer unit, grease trap, and two prep tables belonged to the Debtor and have been for purposes of this case in the sole possession of the Creditors. Since the Debtor has carried her burden to establish superior rights solely with respect to that Equipment, the Court will limit its additional consideration of the conversion and stay violation claims to that Equipment only.

### 2. Whether or Not Creditors Converted the Equipment Remaining on the Premises

In Michigan, the tort of conversion occurs with "any distinct act of domain wrongfully exerted over another's personal property in denial of or inconsistent with the rights therein." _Foremost Ins. Co. v. Allstate Ins. Co._, 439 Mich. 378, 391 (1992). "Though the tort is an intentional tort because the converter's acts are willful, one can also commit this tort while being unaware of the plaintiff's property interest." _Lawsuit Fin., L.L.C. v. Curry_, 261 Mich. App. 579, 591 (2004). "Conversion may be committed by the refusal to surrender a chattel on demand." _Citizens Ins. Co. of Am. v. Delcamp Truck Ctr., Inc._, 178 Mich. App. 570, 575 (1989).

The facts of this case are analogous to those in _Rohe Scientific Corp. v. Nat'l Bank of Detroit_, 133 Mich. App. 462 (1984). In that case, the defendants were held liable for converting plaintiff's medical equipment. _Rohe Scientific_, 133 Mich. App. at 470. The defendants in that case asserted their rights under a purported security agreement to seize the equipment. _Id._ at 468.

15

Although acting in good faith, the security agreements were invalid because the plaintiff's agent

did not have the authority to grant these agreements on behalf of the plaintiff. *Id.* Therefore, that

court held that the defendants:

> had no interest in the equipment and no right to seize the property and refuse to relinquish it upon plaintiff's demand. In light of the claim and delivery order granting plaintiff possession of the equipment and the absence of defendant's right to the equipment, defendant's seizure and refusal to deliver the equipment on demand constituted conversion.

*Rohe Scientific Corp.*, 133 Mich. App. at 470. Extending this reasoning to the current facts, it is

clear that Creditors cannot escape liability for conversion with respect to the Equipment now

situated on the premises. It is undisputed that Creditors have been holding certain property of the

Debtor under a superior claim of right. The argued for good faith nature of their claim is

irrelevant as a defense for conversion. *See J. Franklin Interests, L.L.C. v. Mu Meng*, 296525,

2011 WL 4501841 (Mich. Ct. App. Sept. 29, 2011) (quoting *Poggi v. Scott,* 167 Cal 372, 375

(1914)) ("neither good nor bad faith, neither care nor negligence, neither knowledge nor

ignorance, are of the gist of the action."). Thus, from the time that Debtor demanded her property

back in June of 2010 until the present, Creditors have had no claim of right to the Equipment, yet

have nevertheless refused to surrender it. This plainly constitutes conversion under Michigan

law. *See Thoma v. Tracy Motor Sales, Inc.*, 360 Mich. 434, 438 (1960) (explaining that

conversion may be committed by refusing to surrender property on demand from is owner).

### 3. Damages

Debtor is entitled to damages with respect to her converted property. "The measure of

damages for [common law] conversion is the fair market value [of the property converted] at the

time of the conversion." *In re CMC Telecom, Inc.*, 383 B.R. 52, 65 (Bankr. E.D. Mich. 2008)

(applying Michigan law). Aside from the common law remedy for tort conversion, Michigan, by

statute authorizes treble damages as an additional remedy:

> (1) A person damaged as a result of either or both of the following may recover 3 times the amount of actual damages sustained, plus costs and reasonable attorney fees:
>> (a) Another person's stealing or embezzling property or converting property to the other person's use.
>> \*     \*     \*
> (2) The remedy provided by this section is in addition to any other right or remedy the person may have at law or otherwise.

Mich. Comp. Laws § 600.2919a (2013). Trebling isn't automatic; it is within the Court's

discretion based on what is fair under the circumstances. *See In re Anton*, No. 08-64144, 2013

WL 1747907, at *10 (Bankr. E.D. Mich. Apr. 12, 2013). The Court will decline to treble

damages. Debtor has not provided any evidence of her actual damages and thus they will not be

considered.

This Court finds that Debtor's recovery for the conversion will be limited to the fair

market value of the specific pieces of Equipment, which is $2,670.[5] Debtor may alternatively

elect to have her Equipment returned, in which case her recovery will be reduced in full or in

part by the market value of each piece of Equipment that is returned. *See Even-Heat Co. v. Wade*

*Elec. Products Co.*, 336 Mich. 564, 573 (1953) (permitting the converter to mitigate damages by

returning converted property); *see also* Restatement (Second) of Torts: Return or Tender of

Converted Chattel § 922 (1979) (providing that the court in its discretion may mitigate

conversion damages by ordering return of property). She is not entitled to both damages and

possession, as this would constitute an improper double-recovery. *See Fisher v. Cornell Eng'g*,

---

[5] This figure represents the total of the fair market value as stated by the Debtor of the following: two prep tables ($800 total), the walk-in cooler ($500), two 5 ft. cooler shelving units ($100 total), one 3-compartment sink ($100), two hand sinks ($50 total), fryer ($300), fryer hood ($50), 3 ft. x 6 ft. industrial shelving unit ($20), freezer unit ($700), and the grease trap ($50).

17

No. 270252, 2007 WL 3033955 (Mich. Ct. App. Oct. 18, 2007) (*citing Maycroft v. The Jennings Farms*, 209 Mich. 187, 192–93 (1920)) (holding that common law conversion may not be compensated with both damages for the value of the property and return of the same).

**III.    Debtor's Motions to Hold Royal Management, LLC, Baldwin Summit, LLC, and Marcus Evangelista in Violations of the Automatic Stay and Discharge Injunction**

Since Creditors purchased the Orion Shopping Center, they have been in possession of Equipment lawfully belonging to the Debtor. Once the Debtor filed bankruptcy, this Equipment became subject to the broad protections of the automatic stay. *See In re Campbell*, 398 B.R. 799, 809 ("[B]oth the real property, and the Debtor's personal and/or business property contained in the real property, is included in property of the estate."). Debtor seeks to hold Creditors in violation of several sections of the automatic stay set forth in 11 U.S.C. §§ 362(a)(1)–(8), specifically sections (a)(3), (a)(6), and (a)(7). Debtor also alleges that Creditors violated the bankruptcy injunction pursuant to 11 U.S.C. § 524(a)(2).  In total, the Debtor is seeking an unspecified sum for compensatory and punitive damages, in addition to $27,138.50 in attorneys' fees and $3,311.55 in costs. The Court will consider these claims in turn.

**1.    Section 362(a)(3) Violation**

Debtor asserts that Creditors' acts were barred by § 362(a)(3), which enjoins "any act to obtain possession of property of the estate from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3) (2010). Relief from an alleged § 362(a)(3) violation is governed by 11 U.S.C. § 362(k)(1). "[A]n individual injured by any willful violation of a stay provided by this section shall recover actual damages, including cost and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." *Id.* at § 362(k)(1). "A specific intent to violate the stay is not required, or even an awareness by the creditor that her conduct violates the stay. It is sufficient that the creditor knows of the bankruptcy and engages in deliberate

conduct that, it so happens, is a violation of the stay." *In re Daniels*, 206 B.R. 444, 445 (Bankr. E.D. Mich. 1997). Thus, Debtor must prove that Creditors (1) had knowledge of the bankruptcy and (2) that they acted deliberately, which resulted in a stay violation. *Id.*

### A.  *Creditors' Knowledge of the Debtor's Bankruptcy*

To establish Creditors' knowledge of the automatic stay, Debtor must only show that the Defendant had knowledge of the bankruptcy filing. *In re Wagner*, 74 B.R. 898, 904 (Bankr. E.D. Pa. 1987). The notice of the debtor's bankruptcy "does not need to be formal, so long as the facts would cause a reasonably prudent person to make additional inquiry." *In re Flack*, 239 B.R. 155, 163 (Bankr. S.D. Ohio 1999).  Both parties agree that on June 2010, Debtor's counsel contacted Mr. Evangelista and informed him of Debtor's bankruptcy filing. (Evidentiary Hr'g 47, May 1, 2010, ECF No. 133). They spoke several times thereafter specifically to resolve the issue of the disputed Equipment. Here, communications between attorneys were sufficient to put Creditors on notice of the automatic stay. Mr. Evangelista was the resident agent for both Baldwin Summit and Royal Management and had discussions with their managing members regarding the Equipment dispute. (Evidentiary Hr'g 48, May 1, 2010). As a result, the Court finds that the Creditors had actual notice of the Debtor's bankruptcy in June 2010.

### B.  *The Creditors' Retention And Control of Debtor's Property Did Constitute Willful and Deliberate Action for the Purpose of Section 362*

Section 362(a)(3) covers any act "to exercise control over property of the estate." Congress's failure to define "control" in the statute has led to division among bankruptcy courts as to the scope of (a)(3)'s protection. Specifically, courts disagree as to whether or not a creditor passively withholding bankruptcy estate property constitutes the required control, i.e. whether such encompasses a willfulness and deliberativeness.

The majority approach concludes that simply passively withholding estate property is deliberate for purposes of finding a section (a)(3) violation; whereas the minority approach requires some sort of additional affirmative act, such as selling the property, above and beyond mere control. *Compare In re Sharon*, 234 B.R. 676, 682 (B.A.P. 6th Cir. 1999) (withholding possession of property of the estate violates § 362(a)(3)), *In re Thompson*, 426 B.R. 759, 764 (Bankr. N.D. Ill. 2010) (after remand from Seventh Circuit on this issue, holding that the refusal to turn over estate property is a deliberate and willful violation of § 362(a)(3)), *and In re Abrams*, 127 B.R. 239, 242 (B.A.P. 9th Cir. 1991) (electing to follow the Eighth Circuit and majority trend that knowing retention of estate property is a stay violation), *with In re Young*, 193 B.R. 620, 624–25 (Bankr. D.D.C. 1996) ("In contrast to the act of passively retaining possession, the prohibited act of exercising control implies a more affirmative act by the creditor").

This Court is convinced that under either approach the Creditors in this case surpassed the threshold of a willful (a)(3) violation. The higher bar set by the minority approach insulates creditors that passively retain property, but only when they have a pre-bankruptcy right to possession of the property. *See In re Young*, 193 B.R. 620, 624–25; *see In re Richardson*, 135 B.R. 256, 259 (Bankr. E.D. Tex. 1992). In *In re Young* and *In re Richardson*, the seizing parties had secured rights in the property which entitled them to possession outside of bankruptcy. *Id.* Thus, by merely holding property that they were legally able to seize pre-bankruptcy, they were not deliberately violating the stay. *Id.* However in this case, the Creditors never had any rights in the Equipment. Between June and November of 2010, Creditors repeatedly asserted rights in the Equipment and refused to return it to the Debtor. Moreover, their good faith belief that they did own the property is irrelevant. *In re Bloom*, 875 F.2d 224, 227 (9th Cir. 1989) ("[w]hether the

party believes in good faith that it had a right to the property is not relevant to whether the act was 'willful' or whether compensation must be awarded."). Creditors cannot assert that they were merely acting in good faith to preserve the status quo when they did not have property rights in the Equipment to preserve in the first place. *See In re Thompson*, 426 B.R. at 764 (rejecting creditor's defense to a § 362(a)(3) violation that they had a good faith belief that they needed adequate protection).

The broad protections afforded by the automatic stay do not require the Debtor to initiate legal action to recover estate property. Once the Creditors had notice of Debtor's bankruptcy and her claim to the Equipment, they had an affirmative duty to return the property. *In re Del Mission Ltd.*, 98 F.3d 1147, 1151 (9th Cir. 1996) (holding that § 542(a) creates a mandatory duty to return property to the bankruptcy trustee). "When reasonable, actual notice is received, it becomes a creditor's responsibility to ensure the stay is not violated, or if it has been prior to receipt of actual notice, to reverse any action taken." *In re Flack*, 239 B.R. 155, 163 (Bankr. S.D. Ohio 1999). Since the Creditors had knowledge of the Debtor's bankruptcy, and subsequently acted deliberately to assert title to the property and withhold it from the estate, they have violated § 362(a)(3) and damages shall be assessed pursuant to § 362(k)(1).

## 2. Section 362(a)(6) & (7) Violations

Sections 362(a)(6) and (7) protect the debtor against various actions by the creditor with respect to a prepetition "claim" or "debt." 11 U.S.C. §§ 362(a)(6),(7) (2010). Insofar as the Creditors held a prepetition debt or claim against Debtor via the assignment from Orion Village, they made no attempt to "collect, assess . . . recover . . . [or] setoff" any such pre-petitioner claim or debt. *Id.* Debtor repeatedly points to Ornio Moscane's statement that Orion Village intended to hold the Equipment in lieu of Debtor's back-rent debt. (Moscone Aff. ¶ 14, Ex. 1). However,

Debtor erroneously attributed this statement to the Creditors. Mascone was a managing partner for Orion Village, which is no longer a party to this action. There is no evidence establishing that Creditors' motive in withholding the property involved more than a good faith claim of ownership. Accordingly, Debtor's motion to hold Creditors in violation of the automatic stay on the basis of §§ 362(a)(6) or (a)(7) is denied.

### 3. Violation of Discharge Injunction

The Sixth Circuit has held that § 524 does not provide for a private right of action for violating a discharge injunction. *Pertuso v. Ford Motor Credit Co.*, 233 F.3d 417, 422–23 (6th Cir. 2000). Instead, the power to assess damages for a discharge violation is inherent in the Court's civil contempt power under § 105. *Id.* at 422. To prevail, Debtor must "show[] by clear and convincing evidence that he violated a definite and specific order of the court requiring him to perform or refrain from performing a particular act or acts with knowledge of the court's order." *Glover v. Johnson*, 138 F.3d 229, 244 (6th Cir. 1998) (internal citations omitted). The bankruptcy injunction prevents "the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived . . . ." 11 U.S.C. § 524(a)(2) (2010). Again, Debtor mistakenly attributes Moscone's statement to the Creditors to demonstrate that they withheld the Equipment for a purpose violating the bankruptcy injunction. It is the Court's view that the Defendant's retained the Equipment under a mistaken claim of right, not an ongoing attempt to "collect, recover or offset" a pre-petition debt. 11 U.S.C. § 524(a)(2). Therefore, Debtor's motion to hold Creditors in violation of the discharge injunction is denied.

### 4. Damages

Section § 362(k)(1) of the Bankruptcy Code establishes that "[a]n individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." 11 U.S.C. § 362(k)(1) (2010). While Creditors acted willfully and violated § 362(a)(3), this Court is not persuaded that "appropriate circumstances" are present to warrant punitive damages. Appropriate circumstances exist if the willful violation is "egregious misconduct on the creditor's part such that which is taken in arrogant defiance of federal law." *In re Pawlowicz*, 337 B.R. 640, 647 (Bankr. N.D. Ohio 2005).

Courts have found such egregious conduct in circumstances which go well beyond the violation in this case. *See Budget Serv. Co. v. Better Homes of Va., Inc.*, 804 F.2d 289 (4th Cir. 1986) (creditor's agent injuring debtor during repossession); *see In re Mercer*, 48 B.R. 562 (Bankr. D. Minn. 1985) (creditor kicking down debtor's door in front of children to repossess collateral). Creditors' retention of the Equipment under a claim of right does not meet the high threshold that warrants punitive damages for a stay violation. Accordingly, Debtor's damages are limited to actual damages, costs, and reasonable attorneys' fees.

### CONCLUSION

For the foregoing reasons, the Court finds that Creditors are liable for conversion and for violating § 362(a)(3) of the automatic stay with respect to the following Equipment: (1) walk-in cooler, (2) two 5 ft. cooler shelving units, (3) one 3-compartment sink, (4) two hand sinks, (5) fryer with baskets, (6) fryer hood, (7) 3 ft. x 6 ft. industrial shelving unit, (8) freezer unit, (9) grease trap, (10) and two prep tables. To remedy the conversion, Debtor is entitled to possession of this Equipment or the fair market value of $2,670. To remedy the stay violation, actual

10-41342-wsd    Doc 138    Filed 09/20/13    Entered 09/20/13 16:17:31    Page 23 of 24

damages and reasonable attorneys' fees will be awarded to Debtor and to that end the Court will

conduct an evidentiary hearing on November 12, 2013 at 9:30 a.m. to determine the amount of

those damages, fees, and costs. Incident thereto, Debtor shall file and serve an affidavit of actual

damages, fees, and costs she is seeking, on or before October 21, 2013, to which Creditors may

respond no later than 8 days before said hearing. The Court is contemporaneously entering an

appropriate order.

.

**Signed on September 20, 2013**

/s/ Walter Shapero
————————————————————
**Walter Shapero**
**United States Bankruptcy Judge**